UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No.: 3:12-CR-19 |
| | ) | Judge Phillips |
| ANTHONY J. HARRIS | ) | |

### MEMORANDUM AND ORDER

Defendant Anthony J. Harris was charged with and pleaded guilty to one count of possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Defendant's prosecution was based on his sworn testimony during his previous state court trial for the murder of William Wheeler, in which he admitted possessing a nine millimeter handgun owned by his then-girlfriend. Upon remand from the United States Court of Appeals for the Sixth Circuit, the Court held a resentencing hearing on October 1, 2014, to determine Defendant's sentence. Defendant was initially sentenced to a term of imprisonment of 120 months, the statutory maximum for this offense. *See* 18 U.S.C. § 924(a)(2). This sentence was based, in part, on the Court's application of the cross-reference to second-degree murder under United States Sentencing Guidelines ("Guidelines") § 2A1.2(a). The Sixth Circuit affirmed this Court's implication of the homicide cross-reference gateway provision under § 2K2.1(c)(1)(B). However, the sentence was vacated and the case remanded "for further factual finding and resentencing

only with respect to what constituted the 'most analogous offense guideline' from § 2A1." [Doc. 50 at pp. 21-22.][1]

At the resentencing hearing, the Court heard the testimony of Charles Lee, Investigator with the Knoxville Police Department, received into evidence transcripts of certain testimony from Defendant's state court trial and pretrial proceedings, and copies of the judgments and verdict form from the state court trial. The Court also heard the Defendant's testimony, the arguments of counsel on the appropriate offense Guideline from § 2A1, the Defendant's request for variance, and the parties' positions on sentencing. After taking the matter under advisement, the Court has carefully reviewed the parties' sentencing memoranda [Docs. 54, 57], the evidence presented at the hearing, and the transcripts from the state court trial, along with the factors listed in 18 U.S.C. § 3553(a).

## I.    Sentencing Methodology

After the Supreme Court decided *United States v. Booker*, 543 U.S. 220, 245 (2005), making the Guidelines advisory, district courts have been required to consider the applicable Guideline range, but may "tailor the sentence in light of other statutory concerns as well." *Id.* (citing 18 U.S.C. § 3553(a)); *accord United States v. Stone*, 432

---

[1] The Court's electronic record of the Sixth Circuit's opinion includes a transmittal letter from the Sixth Circuit Clerk's office. [*See* Doc. 50, PageID #363.] Thus, what appears as page 1 of the electronic record is the transmittal letter, rather than page 1 of the Sixth Circuit's opinion. For clarification, any references to the opinion will be to the page numbers as contained within the opinion, rather than to the electronic page numbers.

F.3d 651, 655 (6th Cir. 2005).  Post-*Booker*, the Supreme Court has further detailed the procedure district courts should apply in sentencing:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.  The Guidelines are not the only consideration, however.  Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented.  If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.  We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.  After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

*Gall v. United States*, 552 U.S. 38, 49-50 (2007) (internal citations omitted).  While a sentencing judge need not give a lengthy explanation of his reasons for a sentence within the Guidelines range, the judge will normally address any nonfrivolous arguments for a different sentence presented by either the defendant or the government.  *United States v. Liou*, 491 F.3d 334, 338 (6th Cir. 2007).  *But see United States v. Vonner*, 516 F.3d 382, 387 (6th Cir. 2008) (noting that, at least to survive plain error review, the sentencing court need not address every argument raised by the parties).

Finally, the Court is not prohibited from the necessary exercise of finding facts for the purpose of determining a defendant's advisory Guidelines range post-*Booker*.  In *Vonner*, the defendant argued that his sentence violated the Sixth Amendment because it was based on facts other than convictions that were neither admitted by the defendant nor

3

found beyond a reasonable doubt by a jury. *Id*. at 384-85. The Sixth Circuit *en banc* confirmed that the district court may make factual findings at sentencing that affect a defendant's advisory Guidelines range as long as the court treats the Guidelines as advisory. *Id*. at 385. The *Vonner* court also noted that a defendant accepts as true any factual allegations to which he does not object. *Id*.

## II.    Factual Background

Although the facts underlying Defendant's offense have been summarized by both this Court at the initial sentencing and by the Sixth Circuit, a careful examination of the facts is essential to the Court's task of calculating the advisory Guideline range with respect to the "most analogous offense guideline." It is worth noting that much of the evidence relied upon is testimony from Defendant's state court trial and consists of transcripts of testimony from witnesses that this Court has not had the opportunity to hear or observe and thus form an opinion as to their veracity. The facts surrounding Mr. Wheeler's murder present a picture of several unsavory persons, none of whom are without fault, and whose testimony cannot be completely reconciled. It is also worth noting that the *complete* record of the state court proceedings is not before this Court. Thus, the record before this Court establishes the following facts.

### A.      July 4, 2008

On July 4, 2008, Defendant was living with his then-girlfriend, Lisa Tanniehill, in Knoxville, Tennessee.  [Doc. 57-1 at p. 9.][2]  That morning, Defendant received a phone call from his cousin Juakenda Harden asking him to drive her son Lavee to her home. [*Id.* at p. 6]  Defendant agreed and drove to his cousin's home in Alcoa, Tennessee.  [*Id.*] When he arrived at his cousin's home, Defendant waited approximately ten minutes until his cousin arrived in William Wheeler's car, who was then unknown to Defendant.  [*Id.*] Defendant and Mr. Wheeler struck up a conversation in which Mr. Wheeler revealed, among other things, that he had been smoking crack cocaine for two or three days and he wanted to keep partying.  [*Id.* at pp. 7-8.]  Defendant agreed and Mr. Wheeler followed Defendant to Ms. Tanniehill's home.  [*Id.* at pp. 8-9.]

At Ms. Tanniehill's house, Defendant and Mr. Wheeler began drinking alcohol and talking.  [*Id.* at p. 10.]  According to Defendant, Mr. Wheeler wanted to obtain some more crack cocaine, so they left Ms. Tanniehill's home and went to Mr. Wheeler's home, with Defendant driving Mr. Wheeler's car.  [*Id.* at pp. 10-11.]  After a short time at Mr. Wheeler's home, Defendant and Mr. Wheeler went to the Lonsdale neighborhood to obtain drugs, which they did.  [*Id.* at p. 13.]

Defendant claims that he wanted to go home because he and his girlfriend were having a cookout and that he even offered to have her come pick him up.  [*Id.* at p. 17.] However, Mr. Wheeler did not want to do that; he wanted to get some more crack.  [*Id.* at

---

[2]Defendant's testimony from his state court trial was accepted as Government's Exhibit 4 to the resentencing hearing.  [*See* Doc. 66.]

p. 18.] Unfortunately, neither Defendant nor Mr. Wheeler had any money at that time. So, they planned to ask one of Defendant's acquaintances "for credit" and called his friend Michael Olebe, or "O.D." [*Id.* at p. 18.] Defendant and Mr. Wheeler went to the home of Tina Stinson, Mr. Olebe's girlfriend, off of Ball Camp Pike. [*Id.* at p. 19.] Mr. Olebe refused to give them drugs on credit, so Defendant "offered him a gun to hold until [he] went home and got dropped off."[3] [*Id.* at p. 20.] It is undisputed that the gun in question was a nine millimeter pistol owned by Ms. Tanniehill. According to Defendant, Mr. Olebe accepted this offer, put the pistol in his waist, and gave Defendant $40 worth of powder cocaine. [*Id.*]

The three of them then left Ms. Stinson's home in Mr. Wheeler's car; Mr. Wheeler was driving, Mr. Olebe was in the front passenger seat, and Defendant was in the back seat. [*Id.* at p. 21.] They drove to Regions Bank on Western Avenue, but Defendant cannot say for sure whether Mr. Wheeler obtained money from the ATM. [*Id.* at pp. 21-23.] Next, they drove to Morningside Park, ostensibly where Mr. Olebe would obtain some crack for Mr. Wheeler. [*Id.* at p. 24.] At the park, they met Syeisha Kilby, who was unknown to all of them at the time. [*Id.* at pp. 24-25.] Ms. Kilby had been drinking

---

[3]At the resentencing hearing, Defendant makes much of the fact that he testified in his state trial that he "offered" the gun to Mr. Olebe, rather than he "gave" the gun to Mr. Olebe. [Doc. 67 at pp. 34-36.] Defendant argues the government has presented his testimony as he "gave" the gun to Mr. Olebe solely in order to pursue this federal charge against him and that this is evidence of prosecutorial misconduct. For the purposes of this proceeding, this is a distinction without a difference. Defendant testified that he possessed the gun on July 4, 2008, and that he transferred possession, even if temporarily, to Mr. Olebe in exchange for drugs. Defendant also testified during his resentencing hearing that he "never physically handed Michael Olebe a gun during an exchange for drugs." [Doc. 67 at p. 35.] This statement is clearly contradictory to his prior testimony where he stated that Mr. Olebe accepted his offer and "put it in his waist." [Doc. 57-1 at p. 20.]

alcohol before she met Defendant and his associates. While Defendant and Mr. Wheeler were sharing some vodka that Defendant had brought from his house, Mr. Olebe and Ms. Kilby began talking and she decided to join them. [*Id.* at pp. 25-26.] The group left Morningside Park and drove to Todd Fishback's house to obtain crack for Mr. Wheeler. [*Id.* at pp. 26-27.] On the way to Mr. Fishback's house, Mr. Wheeler was driving, Mr. Olebe was in the front passenger seat, Defendant sat behind Mr. Olebe, and Ms. Kilby sat behind Mr. Wheeler. [*Id.* at p. 27.]

When they arrived at Mr. Fishback's house, the version of events told by Ms. Kilby and Defendant diverge.[4] According to Defendant, he and Mr. Olebe got out of the car and Mr. Olebe went in the house to talk to Mr. Fishback. [*Id.*] Defendant claims that he did not want to be there because he had to turn himself into the federal marshals in six days and this "was a well-known crack house." [*Id.* at pp. 27-28.] He also testified that Mr. Wheeler and Ms. Kilby got into an argument in the car. [*Id.* at p. 135.] After a short time, Mr. Olebe returned to the car and got into a verbal confrontation with Mr. Wheeler. [*Id.* at pp. 30-31.] Then the argument became physical in the back seat of the car. [*Id.* at p. 31.] Defendant testified that he had no idea there would be a fight at Mr. Fishback's house: "There was no reason for a fight. … everything was fine. Everybody was getting along." [*Id.* at p. 56.]

Ms. Kilby testified that Defendant went into Mr. Fishback's house and then when he came back outside he started arguing with Mr. Wheeler because Defendant wanted to

---

[4]It is worth noting that, of the four persons in the car, only Defendant and Ms. Kilby testified at the state trial.

drive. [Doc. 57-2 at p. 7-8.][5] She testified that Defendant and Mr. Wheeler "started scuffling" and Defendant pushed Mr. Wheeler into the back seat while Mr. Olebe pulled him.

Mr. Fishback testified that everyone in Mr. Wheeler's car got out of the car at some point. [Doc. 57-3 at p. 5.][6] Mr. Fishback stated that Mr. Olebe got out of the vehicle, pulled him off to the side, "and said he wanted tough up or rough up – actually he was saying in other words he wanted to whip somebody's butt inside of my home." [Id. at p. 6.] Mr. Olebe "said something about some dollars" and referenced Mr. Wheeler. [Id. at p. 9.] Mr. Fishback responded, "no, it's not happening here." [Id.] Mr. Fishback testified that Mr. Olebe pulled Mr. Wheeler by the mouth from the driver's seat into the back seat and Mr. Wheeler "was flipping around and couldn't breathe" and he "[k]icked the window out behind the driver's seat in my driveway." [Id. at p. 7.] Mr. Fishback never saw a gun in the car. [Id. at p. 10.]

It is undisputed that Mr. Fishback saw a physical altercation with Mr. Wheeler begin and he told them to get off his property. [Id.] It is also undisputed that Ms. Kilby got into the front passenger seat and Defendant got in the driver's seat. [Doc. 57-2 at p. 8.] Defendant admits that they were all intoxicated at this time. [Doc. 57-1 at p. 75.] Defendant started backing the car out of the driveway and Mr. Wheeler kicked the back driver's side window out. [Id. at p. 33.] According to Defendant, Mr. Olebe and Mr.

---

[5]Ms. Kilby's testimony from Defendant's state court trial was accepted as Government's Exhibit 1 to the resentencing hearing. [See Doc. 66.]
[6]Mr. Fishback's testimony from Defendant's state court trial was accepted as Government's Exhibit 2 to the resentencing hearing. [See Doc. 66.]

8

Wheeler continued to struggle and Defendant was telling them to "chill out." [*Id*. at p. 34.] Mr. Olebe then shot Mr. Wheeler in the leg. [*Id*.] They continued to struggle and then Defendant heard another shot. [*Id*. at p. 35-36.] Mr. Olebe continued to beat and stab Mr. Wheeler. [*Id*. at p. 37.] Then, according to Defendant, Ms. Kilby asked for the gun and shot Mr. Wheeler. [*Id*. at pp. 42-43.]

Ms. Kilby testified that, shortly after they left Mr. Fishback's house, Defendant "pulled a gun out of his waistband and told Wheeler to shut up or he was going to kill him, and he pistol whipped him."[7] [Doc. 57-2 at p. 9.] Shortly after that, Ms. Kilby says that Defendant reached between the seats and shot Mr. Wheeler. [*Id*. at p. 9.] Then, Defendant handed the gun to Mr. Olebe and another shot was fired. [*Id.*] After Mr. Olebe shot Mr. Wheeler, he gave the gun back to Defendant. [*Id.* at p. 26.] Ms. Kilby claims only two shots were fired. [*Id*. at p. 40.]

Although Defendant claims to have been scared during this time, he continued driving. Mr. Olebe dumped Mr. Wheeler's body on Riverside Drive, [Doc. 57-1at pp. 44-45], and they drove to the home of Mr. Olebe's former girlfriend, Larissa Harris. [*Id.* at p. 45.] While there, Defendant had a conversation with Derrick Harris, Larissa Harris's brother, but did not ask him for help. [*Id*. at p. 79.] Defendant testified that Ms. Kilby and Mr. Olebe removed evidence from the car and obtained a gas can from a

---

[7]Notably, Ms. Kilby testified at trial that she did not see a gun before this moment. She also acknowledged that her testimony from the preliminary hearing, where she claimed to have seen a gun earlier, was inconsistent with her trial testimony and incorrect. [Doc. 57-2 at p. 51.] Ms. Kilby also admitted that her trial testimony and her preliminary hearing testimony regarding the color of the gun were inconsistent. [*Id*. at pp. 54-55.] Excerpts from Ms. Kilby's preliminary hearing testimony were admitted as Defendant's Exhibit 1 to the resentencing hearing. [*See* Doc. 66.]

neighbor's house while Defendant sat on the porch steps of the house drinking vodka. [*Id.*, p. 153] Ms. Kilby claims that Defendant and Mr. Olebe were cleaning out the car while she was sitting on the stairs. [Doc. 57-2 at p. 42.] Defendant then drove the three of them to a gas station where Ms. Kilby purchased seventy-five cents worth of gas and returned to Mr. Olebe's house, which, incidentally, is down the street from Mr. Fishback's house. [Doc. 57-1 at p. 46-48.] Mr. Olebe poured gas on Mr. Wheeler's car and Ms. Kilby set it on fire. [*Id.* at p. 48.]

Derrick Harris testified that when he came to his sister's house on July 4, 2008, Mr. Olebe was in front of the house and he was sweating and his eyes were big. [Doc. 57-4 at p. 5.][8] Defendant was sitting on the steps on the side of the house and drinking a half gallon of vodka. [*Id.* at p. 6-7.] Derrick Harris stated that Defendant was shaking his head, mumbling and said "we just f-d someone up." [*Id.* at p. 7.] Derrick Harris clarified that Defendant initially stated, "[t]hat's messed up. That's messed up." [*Id.* at p. 14.] Then, Defendant stated "that's f-d up" and then "we had to 'f' somebody up." [*Id.*] Defendant seemed out of it and distraught at the time. [*Id.* at p. 14-15.] Mr. Harris observed a female cleaning out a car. [*Id.*] Mr. Harris testified he thinks, but is not certain, that he saw something in Defendant's waist, "like a gun." [*Id.* at pp. 7-8.] Mr. Harris told Defendant that he had to get out of there. [*Id.* at p. 9.]

From there, Defendant and Ms. Kilby temporarily parted ways with Mr. Olebe. Defendant and Ms. Kilby walked to Defendant's ex-father-in-law's house. [Doc. 57-1 at

---

[8]Derrick Harris's testimony from Defendant's state court trial was accepted as Government's Exhibit 3 to the resentencing hearing. [*See* Doc. 66.]

p. 49.] Ms. Kilby claims that after the car was set on fire, they walked to what she believed was Defendant's uncle's house. [Doc. 57-2 at pp. 13-15.] There, she says Defendant "gave the gun to his uncle and his uncle took it down in the basement, and he burned and smashed the victim's cell phone in the back yard." [*Id.* at p. 16.] They reunited with Mr. Olebe and went to the Walter P. Taylor neighborhood. [Doc. 57-1 at p. 50.] Defendant called his girlfriend and she picked him and Ms. Kilby up and dropped them at a nearby bar called Gene's Place. [*Id.* at pp. 51-52.] Ms. Kilby testified that when Ms. Tanniehill gave them a ride to Gene's Place, Ms. Tanniehill told Defendant "that her gun was missing and that if he didn't bring it back by in the morning that she was going to call the police and report it stolen because she wasn't going to get in trouble for anything he did with it." [Doc. 57-2 at p. 19.] At some point that evening, Defendant admittedly obtained the gun from Mr. Olebe and returned it to his girlfriend. [Doc. 57-1 at p. 53.]

### B.    The Investigation

At both the initial sentencing hearing and the resentencing hearing, Charles Lee, Investigator with the Knoxville Police Department, testified as to his investigation of Mr. Wheeler's murder. In the course of his investigation, Mr. Lee spoke with Defendant several times. [Doc. 67 at p. 10.] However, Mr. Lee testified that Defendant only gave one substantive interview about the offense on August 7, 2008, which was audio and video recorded. [*Id.*, and p. 18] Their initial conversations, prior to August 7, consisted of whether Defendant wanted to provide a statement about the events of July 4. [*Id.* at pp. 10-11.] Mr. Lee had a couple of additional meetings with Defendant after August 7,

11

during which Mr. Lee was trying to identify a female that was present during the events. [*Id.* at p. 11.] During the August 7 interview, Defendant did not disclose how Mr. Olebe came into possession of a gun on July 4 or who owned the gun. [*Id*. at p. 12.] Mr. Lee testified that Defendant did not disclose until his state court trial that he gave the gun to Mr. Olebe. [*Id.* at p. 13.] Mr. Lee also testified that Defendant did not disclose until his state court trial that Ms. Kilby shot Mr. Wheeler. [*Id*. at p. 14.] Finally, Mr. Lee testified that Defendant described his conversation with Derrick Harris on July 4 as Defendant telling Derrick Harris, "Oh, that man [Mr. Olebe] driving the vehicle there just killed somebody," contrary to what Derrick Harris told Mr. Lee and to what he testified during Defendant's trial. [*Id*. at p. 67.]

Defendant testified that he contacted Mr. Lee and agreed to give him statement on the record in exchange for immunity because he did not want to be charged with a gun crime. [*Id*. at p. 30.] Defendant claims he agreed to first talk to a detective he previously worked with named Sam Brown and that he gave an audio and video recorded interview with Mr. Brown prior to his interview on August 7 with Mr. Lee. [*Id.* at p. 31.] Defendant claims he was promised a "big time cut" for his cooperation and that he would not be charged with the murder or being a felon in possession of a firearm. [*Id*. at pp. 31-32.] Defendant claims he told Mr. Lee about every witness that testified for the state and that Ms. Kilby shot Mr. Wheeler. [*Id*. at pp. 33-34.]

### C.    Defendant's State Court Trial

On March 1-5, 2011, Defendant was tried for the murder of William Wheeler in the Criminal Court for Knox County, Tennessee in case number 96566B. Defendant was

12

found guilty of one count of facilitation of attempted second-degree murder, guilty of two counts of facilitation of felony murder, and sentenced to a twenty-two year term of imprisonment. [*See* Doc. 66, Def. Exs. 2, 3.] After the conclusion of the state court trial, Defendant was indicted for the instant offense.

### III. Discussion

#### A. Advisory Guidelines Range

The probation office calculated Defendant's advisory Guidelines range in the presentence report ("PSR"). Defendant's base offense level is 14 since he was a prohibited person at the time of the instant offense. U.S.S.G. § 2K2.1(a)(6). Two levels were added because the firearm was reported stolen by Ms. Tanniehill. U.S.S.G. § 2K2.1(b)(4)(A). Another four levels were added because the gun was used or possessed in connection with another felony offense, in this case, the transaction to purchase drugs and Mr. Wheeler's murder. U.S.S.G. § 2K2.1(b)(6)(B). Notably, this four-level enhancement was affirmed by the Sixth Circuit. [Doc. 50 at pp. 8-11.] Defendant has a criminal history category of IV and received a reduction by three levels for acceptance of responsibility. U.S.S.G. § 3E1.1(a) & (b).

Next, and critically for our purposes, the PSR applied the cross-reference in U.S.S.G. § 2K2.1(c)(1)(B) because the Defendant used or possessed the firearm in connection with the commission or attempted commission of another offense and death resulted. The Guidelines instruct the sentencing court to apply "the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting

13

offense level is greater than that determined above." U.S.S.G. § 2K2.1(c)(1)(B). The probation officer recommended the application of the cross-reference to second-degree murder based on the facts that the defendant traded the firearm for drugs and therefore "put into motion a series of events" that led to Mr. Wheeler's death. However, the Sixth Circuit found that reliance on this language without further findings of malice aforethought was in error. [Doc. 50 at p. 15.] Application of the second-degree murder cross-reference resulted in a total offense level of 35, a Guideline range of 235-293 months, but the term of imprisonment was capped by the statutory maximum of 120 months. Again, as noted initially, the Sixth Circuit affirmed the implication of the homicide cross-reference [Doc. 50 at p.12], but remanded for further consideration and factual findings on which of the four possible offenses was the most analogous homicide: first-degree murder, second-degree murder, voluntary manslaughter, or involuntary manslaughter. [*Id*. at pp. 13, 21.] Specifically, the Sixth Circuit instructed that the court needed to make factual findings as to the mens rea required for the most analogous offense. [*Id*. at p. 16.] Importantly, the Court must determine Defendant's mens rea *at the time of the homicide. See generally Black's Law Dictionary* (9th ed. 2009) (defining "mens rea" as "the state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime").

The government argues that first-degree murder is the most analogous offense, relying on 18 U.S.C. § 1111(a):

> Murder is the unlawful killing of a human being with malice aforethought. Every murder … committed in the perpetration of, or attempt to perpetrate

… kidnapping … is murder in the first degree.  Any other murder is murder in the second degree.

Thus, the Court would have to find malice aforethought for the application of either the first- or second-degree murder cross reference.  *See United States v. Milton*, 27 F.3d 203, 206 (6ᵗʰ Cir. 1994) ("Second degree murder … requires a finding of malice aforethought.").  The Sixth Circuit has found that malice aforethought may be shown by a "gross deviation from a reasonable standard of care" or "when the defendant grossly deviates from the standard of care to such an extent that a jury could conclude that he must have been aware of a serious risk of death or serious bodily injury."  *United States v. McClellan*, 436 Fed. App'x 479, 486 (6ᵗʰ Cir. Aug. 24, 2011) (quoting *Milton*, 27 F.3d at 208, and *United States v. Conaster*, 514 F.3d 508, 523 (6ᵗʰ Cir. 2008) respectively).  Further, the Sixth Circuit has held that section 1111 permits the inference of malice from the intent to commit the underlying felony.  *See McClellan*, 436 Fed. App'x  at 489 (J. White, concurring); *United States v. Watkins*, 86 F.3d 1157 (Table), 1996 WL 272391 at *3 (6ᵗʰ Cir. May 20, 1996).

The government argues that Defendant intended to kidnap Mr. Wheeler; thus, the requirement of malice aforethought is satisfied because the victim was killed during the perpetration of a felony.  [Doc. 57 at pp. 2-3.]  The government points to Mr. Fishback's testimony that Mr. Olebe said "he wanted to tough up or rough up" [Doc. 57-3 at p. 6] somebody as evidence of a plan to beat up Mr. Wheeler and that Defendant was surely aware of the plan.  [*See* Doc. 67 at p. 49.]  If the Court applies the cross-reference to first-degree murder, the defendant would have a total offense level of 40 and a Guideline

15

range of 360 months to life, but the sentence would be capped by the statutory maximum of 120 months. Defendant argues that the government cannot prove the requisite mens rea to support a cross-reference to first- or second-degree murder "as he offered the gun only in exchange for drugs." [Doc. 54 at pp. 4-5.] Instead, he contends that his conduct was at most negligent and therefore involuntary manslaughter is the most analogous homicide offense. [*Id.* at p. 10.]

Even accepting Mr. Fishback's testimony as true, it is only evidence of a plan by Mr. Olebe, not Defendant, to beat up Mr. Wheeler. Mr. Fishback suggests that the dispute between Mr. Olebe and Mr. Wheeler was about money – "he said something about some dollars" [Doc. 57-3 at p. 9] – but this too only implicates Mr. Olebe and not Defendant. Mr. Fishback testified that Mr. Olebe pulled Mr. Wheeler into the back seat [Doc. 57-3 at p. 7], which corresponds to Defendant's version of how the argument became physical [Doc. 57-1 at p. 31]. Ms. Kilby, however, testified that Mr. Olebe pulled Mr. Wheeler into the back seat while Defendant pushed him. [Doc. 57-2 at p. 8.] In order to credit her testimony and thus conclude that Defendant kidnapped Mr. Wheeler, the Court would have to discredit the testimony of both Defendant and Mr. Fishback. Even under a preponderance of the evidence standard, the Court finds that this is too thin a reed to sustain such a significant sentencing enhancement.

The government also relies on Ms. Kilby's testimony that Defendant had the gun and fired the first shot at Mr. Wheeler. [Doc. 57-2 at p. 9.] She also testified that she never had the gun and that only two shots were fired. However, Defendant testified that he never had the gun in the car and that Ms. Kilby fired the third and last shot at Mr.

16

Wheeler. These contradictory versions of events cannot both be true. Obviously, both Defendant and Ms. Kilby have a self-interested motivation to put the gun in each other's hand and both were admittedly under the influence of drugs and/or alcohol at the time. Ms. Kilby admitted that her testimony from the preliminary hearing and the state trial is inconsistent on certain points. Further, at the time of these events, Ms. Kilby had outstanding warrants for violation of probation in Loudon County and she has since been convicted of forgery in South Carolina. [*Id.* at p. 22.] Thus, her credibility as a witness is suspect. Again, the Court simply cannot conclude, even under a preponderance of the evidence standard, that there is sufficient evidence to believe Ms. Kilby, discredit the Defendant, and conclude that he shot Mr. Wheeler.

The government also points to Derrick Harris's testimony that Defendant said, after the fact, "we just f'd someone up." [Doc. 57-4 at p. 7.] Derrick Harris also testified that he thought Defendant had something "like a gun" in his waist, but he could not say for certain. [*Id.* at p. 8.] Even accepting this testimony as true, it demonstrates Defendant's mental state *after* Mr. Wheeler's murder, but not at the time. If Defendant had a gun after the murder, it does not necessarily follow that he fired any of the shots. In sum, the Court cannot conclude that the government has carried the burden to show by a preponderance of the evidence that Defendant's conduct grossly deviates from the standard of care to such an extent that a jury could conclude that he must have been aware of a serious risk of death or serious bodily injury.

Having concluded that the government has not proven malice aforethought to support either a first- or second-degree murder cross-reference, the Court turns to

whether the cross reference to involuntary manslaughter is appropriate. Title 18 U.S.C. §

1112(a) defines manslaughter as "the unlawful killing of a human being without malice."

Involuntary manslaughter occurs in "the commission of an unlawful act not amounting to

a felony, or in the commission in an unlawful manner, or without due caution and

circumspection, of a lawful act which might produce death."[9] *Id.* If the Court applied the

cross-reference to involuntary manslaughter based on "criminally negligent" conduct,

defined as a "gross deviation from the standard of care that a reasonable person would

exercise under the circumstances," U.S.S.G. § 2A1.4(a)(1), the defendant would have a

total offense level of 17 and a Guideline range of 37 to 46 months.[10] If the Court applied

the cross-reference to involuntary manslaughter based on "reckless conduct," defined as

"a situation in which the defendant was aware of the risk created by his conduct and the

risk was of such a nature and degree that to disregard that risk constituted a gross

deviation from the standard of care that a reasonable person would exercise in such a

---

[9]The statute also contains a provision for voluntary manslaughter, which is the unlawful killing of a human being without malice "upon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). Neither the government nor the Defendant suggests that voluntary manslaughter would be the most analogous offense and there is little to support such a finding in the record. Both Defendant and Mr. Fishback testified that the argument was between Mr. Olebe and Mr. Wheeler. Only Ms. Kilby testified that Defendant and Mr. Wheeler began arguing because Defendant wanted to drive.

[10]Because Defendant's base offense level of 14 per U.S.S.G. § 2K2.1 is greater than that calculated under the cross-reference to involuntary manslaughter, U.S.S.G. § 2K2.1(c)(1)(B), that sentence would control. Beginning with a base offense level of 14, the addition of the two-level and four-level enhancements of U.S.S.G. §§ 2K2.1(b)(4)(A) and 2K2.1(b)(6)(B) and less the three-level adjustment for acceptance of responsibility would result in a total offense level of 17.

situation," U.S.S.G. § 2A1.4(a)(2), the defendant would have a total offense level of 21 and a Guideline range of 57-71 months.[11]

After careful review of the record, including the exhibits and testimony presented at the resentencing hearing, the Court finds that involuntary manslaughter based on criminally negligent conduct is the most analogous homicide offense cross-reference. The preponderance of the evidence demonstrates that Defendant gave the gun to Mr. Olebe as collateral for drugs. There is no evidence of a brewing disagreement between Defendant and Mr. Wheeler or Mr. Olebe and Mr. Wheeler prior to their arrival at Mr. Fishback's house. There is no evidence that Defendant was involved in or aware of any plot to harm Mr. Wheeler. There is simply no evidence in this record that Defendant could have foreseen, at the time that he transferred the gun to Mr. Olebe, that the gun would be used to kill Mr. Wheeler. While Defendant's conduct was certainly foolish and a gross deviation from the standard of care that a reasonable person would exercise, there is nothing to suggest that Defendant was aware of the risk that his conduct at the time of the transfer would result in Mr. Wheeler's death. Accordingly, the Court finds that Defendant has a total offense level of 17 and a Guideline range of 37 to 46 months.

Defendant also argues, as he did at the initial sentencing, for a variance from the Guidelines based on his truthfulness and cooperation. [Doc. 54 at pp. 11-13.] While this issue is precluded by the scope of the limited remand, it will be considered in the context

---

[11]The application of the involuntary manslaughter cross-reference based on reckless conduct, U.S.S.G. § 2A1.4(a)(2)(A), results in a base offense level of 18 plus the six levels of enhancement referenced *supra* and less the three-level adjustment for acceptance of responsibility would result in a total offense level of 21.

of the § 3553(a) factors.  *See United States v. McFalls*, 675 F.3d 599, 604 (6th Cir. 2012)

("[a] limited remand … does not allow *de novo* resentencing and instead constrains the

district court's authority to the issue or issues adjudicated").


## IV.     Imposition of a Sentence

Federal sentencing is governed by 18 U.S.C. § 3553(a), which requires sentencing

courts to consider the following factors:

> (1)     the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2)     the need for the sentence imposed –
>> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B)     to afford adequate deterrence to criminal conduct;
>> (C)     to protect the public from further crimes of the defendant; and
>> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3)     the kinds of sentences available;
> (4)     the sentencing range established by the guidelines;
> (5)     any pertinent policy statements issued by the Sentencing Commission;
> (6)     the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7)     the need to provide restitution to any victims of the offense.

After considering all of these factors, a court must "impose a sentence sufficient, but not

greater than necessary, to comply with the purposes set forth in paragraph 2."  18 U.S.C.

§ 3553(a).


## 1.     Nature and Circumstances of the Offense

Defendant and Mr. Wheeler met on the morning of July 4, 2008, and spent the day drinking alcohol and procuring and using illegal drugs. Defendant, by his own testimony, possessed a stolen firearm that was used to murder William Wheeler. Defendant traded the firearm to Mr. Olebe, who Defendant and Ms. Kilby agree fired at least one shot, as collateral for cocaine. Defendant took Mr. Wheeler to a known crack house, and then drove Mr. Wheeler away while he was engaged in a physical altercation with Mr. Olebe. According to Defendant, Mr. Olebe shot Mr. Wheeler twice and Ms. Kilby shot him once. According to Ms. Kilby, Defendant shot Mr. Wheeler once and then Mr. Olebe shot Mr. Wheeler once. There is no dispute that, prior to his death, Mr. Wheeler was beaten and stabbed repeatedly by Mr. Olebe. During the course of the altercation between Mr. Olebe and Mr. Wheeler, Defendant was driving and admittedly took no steps to stop the car, to intervene, to seek assistance, or to leave the scene. Defendant continued to drive the car and was present when Mr. Wheeler's body was dumped on the side of the road. Suffice it to say that this was a serious offense that led to Mr. Wheeler's death.

### 2. History and Characteristics of the Defendant

Defendant is now a 45- year old man who has a history of mental health issues and substance abuse problems. As documented in the PSR, Defendant has completed substance abuse treatment programs, but has never followed up with recommended after-care. He has shown a tendency to become violent when he is under the influence of drugs or alcohol. Defendant has received Social Security disability benefits in the past, initially for drug and alcohol dependence and later for paranoia and nervous disorders.

Defendant has been diagnosed with bipolar disorder, panic disorder, alcohol dependence, cocaine dependence, and a paranoid-schizoid personality disorder. The defendant completed high school and has additional training as a barber and as a truck driver. His criminal history contains assault charges, obstructing police, possession with intent to distribute cocaine base, public intoxication, disorderly conduct, and driving violations. He has a conviction for aggravated assault resulting from a previous incident during which the Defendant shot an individual, resulting in felony conviction for aggravated assault in 1994. At the time of the instant offense, Defendant was under indictment in this Court for a charge of possession with intent to distribute cocaine.

### 3. Seriousness of the Offense

Defendant's possession of a firearm as a convicted felon, standing alone, is a serious offense. However, as described herein, the facts surrounding Defendant's bartering of the gun to facilitate a drug transaction and the eventual death of William Wheeler elevate the seriousness of the offense. The sentence the Court imposes should reflect the seriousness of the offense, promote respect for the law, and provide just punishment. The Court finds that a sentence in the range of 37 to 46 months would fulfill this factor.

### 4. Deterrence

The Court must next consider the need for the sentence imposed to act as both specific deterrence to this defendant and as general deterrence to those who may contemplate similar crimes in the future. *See United States v. Turner*, 173 Fed. App'x 402, 407-08 (6th Cir. Mar. 8, 2006). As to this defendant, considering the nature and

circumstances of the offense and the history and characteristics of this Defendant, including but not limited to his criminal history, the Court finds a significant need for the sentence imposed to afford adequate deterrence. Specifically, it is necessary to separate the defendant from the public to inhibit his ability to commit future crimes and cause harm to the public. The Court is also mindful of the need for a sentence to act as a general deterrent, that is, to serve as a reminder to others that possession of a firearm by a convicted felon is itself a punishable offense and that the punishment may be enhanced when that firearm is used to cause the death of an individual.

### 5.    Protecting the Public

Defendant needs to be incarcerated for a period of time to prevent him from reoffending. As set forth above, Defendant has a history of criminal offenses and substance abuse. He was facing detention on another federal charge at the time of the instant offense. While Defendant has admitted some of his actions that contributed to Mr. Wheeler's death, he has minimized his culpability in stopping the attack or seeking assistance. He testified that he did not intend for Mr. Wheeler and Mr. Olebe to get in a fight, and he did not intend on Mr. Wheeler getting taken against his will, shot, or dying that day. [*Id*. at p. 56-57.] However, Defendant also admitted that he did not have a problem setting up drug deals with Mr. Wheeler. [*Id*. at p. 140.] He agreed that he could have walked away from Mr. Fishback's house. [*Id*. at p. 141.] He also admittedly never stopped the car when Mr. Wheeler and Mr. Olebe were fighting. "I can't assist no one in the backseat while I'm driving a car keeping my eyes on the road with a half a gallon of

vodka between my legs. …I just couldn't save him." [*Id.* at p. 144.] The Court believes otherwise.

Defendant's focus of this entire proceeding has been on how unfairly he has been treated by various investigators, prosecutors, defense attorneys, and the criminal justice system. In other words, he has focused entirely on the severity of his punishment, rather than the circumstances of his offense. Because Defendant has continued to engage in illegal conduct, even in the face of pending criminal charges, and has continued to abuse drugs and exhibit poor judgment, the Court find the need to protect the public from further crimes by the Defendant.

### 6. Rehabilitation

As set forth above, Defendant has a history of mental illness and substance abuse and the current offense occurred while Defendant was under the influence of illegal drugs and alcohol. Defendant is in need of and the Court will recommend that the Defendant receive 500 hours of substance abuse treatment from the Bureau of Prisons' Institution Residential Drug Abuse Treatment Program. The Court will also recommend that Defendant receive mental health treatment from the Bureau of Prisons.

### 7. Sentencing Disparities

The advisory Guidelines are intended, in part, to carry out the national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. *See United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007). The Court finds that the advisory

Guideline range, as calculated above, adequately reflects Defendant's actual conduct and history.

### 8. Restitution

The Court does not find this factor applicable in this case as that term is utilized in 18 U.S.C. § 3553.

### V. Conclusion

In light of the § 3553 factors set forth above and the advisory Guidelines range in light of the entire record, the Court will impose a sentence of **46** months imprisonment. This term is to be served concurrently with Docket Number 96566B of the Criminal Court of Knox County, Tennessee, and consecutively with Docket Number 3:08-CR-87-001, in the United States District Court, Eastern District of Tennessee. This sentence is at the top of the advisory Guideline range and is intended to reflect the seriousness of the offense, protect the public, provide specific deterrence, and affords Defendant needed treatment. The Court finds that this sentence is sufficient, but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553. Additionally, in light of the factors discussed, the Court denies Defendant's request for a downward variance. All other aspects of the Court's original judgment are unchanged.

A Judgment shall enter.

    s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE